UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
                               :

UNITED STATES OF AMERICA,        :
                               :

                   Plaintiff,    :

                               :             24-CR-212-1 (VSB)

        - against -          :

                               :             **OPINION & ORDER**

BRIAN MEJIA,                   :
                     Defendant.  :
                               :
------------------------------------------------------X

<u>VERNON S. BRODERICK</u>, United States District Judge:

       Before me is the motion of Defendant Brian Mejia ("Defendant" or "Mejia") to suppress

various items seized during searches related to this case and his statements made after his arrest.

Because I find that the Government established that the plain-view exception and/or incident-to-

arrest exception apply to the seized vest, ammunition, and cellphone, and therefore the search

warrant for the cellphone was supported by probable cause, and because I find that Defendant

did not unambiguously invoke his Fifth Amendment rights before making certain statements,

Mejia's motion to suppress is DENIED.

     **I.**     <u>**Factual Background**</u>[1]

         **A.**  *Shootings on February 28 and 29, 2024*

       On the morning of February 28, 2024, 911 operators received a call about gunshots being

fired on a specific floor of an apartment building in the Bronx.  (Compl. ¶ 5.a.)[2]  When law

enforcement officers arrived on that floor, they found that an apartment unit's door "had

apparently been shot at."  (*Id.*)  The law enforcement officers recovered two spent .380-caliber

---

[1] The statements in this section are based on assertions and allegations contained in the criminal complaint, indictment, and documents filed in connection with the motions to suppress.
[2] "Compl." refers to the Complaint filed on March 11, 2024.  (Doc. 1.)

shell casings, and a deformed bullet from the hallway near that apartment door.  (*Id.*)
Surveillance footage obtained later revealed that an individual—wearing "a black 'puffer'-style
vest, which had a small white logo on the left side, a black hooded sweatshirt, black pants, and
black and silver sneakers"—ran out of the apartment building shortly after the gunshots were
fired.  (*Id.* ¶ 5.b.)  I will refer to this incident as the "Door Shooting."

  The next day, on February 29, 2024, the New York Police Department ("NYPD")
responded to a possible shooting at a convenience store in the Bronx.  (*Id.* ¶ 6.a.)  Video
surveillance showed that an individual—wearing "a black 'puffer'-style vest, which had a small
white logo on the left side, a black hooded sweatshirt, black pants, and black and silver sneakers"
—got out of a car and walked into the convenience store.  (*Id.* ¶ 6.c.)  The individual was
wearing a black mask.  (*Id.*)  The individual walked into the store and spoke to two individuals
for several minutes, before beginning to exit the store.  (*Id.* ¶ 6.b–d.)  The masked individual
walked out of the store, pulled out a gun, turned, and stood at the doorway and began to shoot, as
customers were entering the store, at one of the two individuals with whom he had been
speaking.  (*Id.* ¶ 6.d.)  Law enforcement later recovered a total of six spent .380-caliber shell
casings from inside and in front of the convenience store.  (*Id.* ¶ 6.f.)  I will refer to this incident
as the "Convenience Store Shooting," and together with the Door Shooting, I will collectively
refer to the two shootings as the "February 2024 Shootings."

  An Indictment was filed on April 8, 2024, charging Mejia with three counts of possessing
ammunition after being convicted of a felony, in violation of 18 U.S.C. § 922(g)(1) and 18
U.S.C. § 2.  (Doc. 6 ("Indictment").)

### B.  *Identification of Defendant as the Shooter*

Jared Tepperman, a Detective with the NYPD and a Task Force Officer with the Department of Homeland Security – Homeland Security Investigations, reviewed the Instagram account of user banko2.shiesty, which Detective Tepperman believes is used by Mejia.  (Compl. ¶ 7.)  Detective Tepperman also believes that Mejia was the shooter in the February 2024 Shootings, based on banko2.shiesty's various Instagram posts where it appears that Mejia is wearing the same clothes as the shooter, including silver sneakers and a black vest.  (*Id.* ¶ 8.)

Detective Tepperman also learned that Mejia was shot in the leg on or about February 28, 2024, about nine hours before the Door Shooting.  (*Id.* ¶ 9.)  A law enforcement officer's body-worn camera footage shows Mejia to be wearing "black and silver sneakers that are consistent with those he wore in images posted on the [banko2.shiesty Instagram account] and those worn by the Shooter" and "[a] black 'puffer'-style outer garment also appears to be visible immediately to MEJIA's right."  (*Id.*)

### C.  *Apartment Search and Seizure*

The parties dispute the events surrounding the search and seizure of items in the apartment of the mother of Defendant's girlfriend (the "Apartment") in the Bronx on the morning of March 19, 2024.  (Def. Mem. 3.)[3]  According to Defendant, before 6:00 a.m., NYPD officers entered the Apartment to execute an arrest warrant for Defendant and found him sleeping on a bed next to his girlfriend in a bedroom.  (*Id.*)  Law enforcement officers handcuffed Defendant and moved him to the living room, where he was then surrounded by multiple armed agents.  (*Id.* at 3–4.)  Defendant was not read his *Miranda* rights at that time.  (*Id.* at 4.)

---

[3] "Def. Mem." refers to the memorandum of law in support of Defendant's motion to suppress certain physical evidence and statements, filed on November 4, 2024.  (Doc. 15.)

The Government explains that prior to Mejia's arrest, law enforcement obtained a warrant authorizing the use of a cell site simulator—known as a "triggerfish" device—to identify the location of a specific phone. (Opp'n 4–5.)[4] After law enforcement officers tracked the phone to the Apartment, they entered the Apartment and found Mejia asleep in a bedroom with his girlfriend. (*Id.* 5.) Law enforcement officers observed, among other things, a black vest "hanging from a curtain rod next to the bed," and a black ski mask. (*Id.*) Officers also "recovered a cell phone from the bed." (*Id.*) The Government requested consent to search the apartment, but that request was denied. (*Id.*) Detective Tepperman explained to the people in the Apartment, which included the mother of Mejia's girlfriend, that law enforcement would have to "freeze" the Apartment until they could obtain a search warrant. (*Id.*) Later, Detective Tepperman asked Mejia's girlfriend if she knew where he kept his gun. (*Id.* 5–6.) She responded that everything in the room belonged to her. (*Id.* 6.) When asked whether she consented to a search of the room, Defendant's girlfriend stated that she would need to speak to her mother, who was also in the Apartment.[5] (*Id.*)

At 9:04 a.m., Magistrate Judge Gary Stein authorized a search warrant of the Apartment, limited to a "firearm and/or ammunition" and "[b]lack and silver sneakers." (*See id.* 6; Opp'n, GX 2 at BM_000004.) Around 9:14 a.m., law enforcement began conducting a search of the Apartment. (Opp'n 6.) When law enforcement officers concluded the search at around 10:02 a.m., the two law enforcement officers who had activated their body-worn cameras turned them off. (*Id.*) At some point after the officers turned off their body-worn cameras, as law enforcement officers were moving the seized black vest, three ".380 caliber cartridges fell out of

---

[4] "Opp'n" refers to the Government's opposition brief filed on December 5, 2024. (Doc. 18.)
[5] Law enforcement officers understood the mother of Mejia's girlfriend to be the leaseholder of the Apartment. (Opp'n 5.)

the Black Moncler Vest and were recovered." (*Id.* 17 (quoting Opp'n, GX 4).)  However, the

body-worn cameras did not capture the exact moment when the ammunition allegedly fell out of

the vest.  (Def. Mem. 14.)  Instead, the cameras were turned on after the bullets fell out of the

vest, and captured law enforcement agents "searching for, photographing, and recovering

ammunition that had fallen on the ground."  (Opp'n 17.)  Law enforcement officers

photographed and documented the various items in the Apartment.  (*Id.* 6.)

### D.  *Interrogation at an NYPD Facility*

Earlier that morning, at 7:53 a.m., while some law enforcement officers remained at the

Apartment, Detective Tepperman brought Mejia, who was handcuffed, into an "interrogation

room" at the 44th Precinct (the "Precinct").  (Def. Mem. 21; *see also* Opp'n 9.)  Once inside,

Tepperman took off the handcuffs and ordered Mejia to take a seat.  (Def. Mem. 21.)  Two other

law enforcement officers entered the room as Mejia began to be questioned.  (*Id.*)  Tepperman

asked Mejia several questions for about two minutes before reading his *Miranda* rights.  (*Id.*)

The Government contends that these were "routine pedigree-type questions," such as questions

about where Defendant lived, with whom, and for how long.  (Opp'n 7.)

The Government states that Tepperman then read Defendant his *Miranda* rights, and that

Defendant verbally confirmed his understanding of each *Miranda* right after Detective

Tepperman read that right to him.  (*Id.*)  Detective Tepperman later asked, "So just a yes or no,

are you willing to answer questions?"  (Def. Mem. 21.)  Defendant replied that he was not

willing to answer questions but was willing to hear about the reasons for his arrest.  (*Id.*)

Tepperman proceeded to tell Defendant about his federal arrest warrant in connection with two

shootings in February 2024.  (*Id.* at 21–22; Opp'n 8.)   At one point, Defendant asked why he

kept "having to go to the federal system" while other people who committed shootings were

being sent to Rikers Island.  (Opp'n 8.)  This led to further discussions between Defendant and members of law enforcement, including Mejia asking what would occur "if they say it wasn't me," given the understanding that "if I do something to somebody, don't they gotta say it was me?"  (*Id.*)  Defendant also stated that he "didn't mind a little eight, ten years," and hoped that he would "come back wiser this time."  (*Id.*)  The interview concluded and Mejia was taken out of the interrogation room into a cell block area.  (*Id.* 9.)  During the walk to the cell block, Mejia asked Detective Tepperman again:  "What if they say it wasn't me?  You don't think I will get off?"  (*Id.* 9.)  Detective Tepperman asked, "you think your boy will do that?"  (*Id.*)  Defendant responded:  "He better, that bitchass N(N word)."  (*Id.*)  Defendant then stated, "I didn't say anything."  (*Id.*)

## II.    Procedural History

On March 11, 2024, the Government filed a complaint, which was based on the sworn statements of Detective Tepperman and later signed and approved by Magistrate Judge Stewart D. Aaron, who also authorized the issuance of an arrest warrant for Mejia.  (*See* Compl.; Doc. 2 (arrest warrant).)  On April 8, 2024, the Government filed an indictment, charging Defendant with three counts of possessing ammunition after being convicted of a felony, in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 2.  (*See* Indictment.)

On November 4, 2024, defense counsel filed a motion to suppress certain physical evidence and statements made by Mejia.  (Doc. 13.)  Defense counsel also filed a declaration, (Doc. 14), and a memorandum of law in support of the motion, (Doc. 15 ("Def Mem.")).  On December 5, 2024, the Government filed its opposition brief, attaching several exhibits.  (Doc. 18 ("Opp'n").)  On January 8, 2025, defense counsel filed a reply brief.  (Doc. 24 ("Reply").)

That same day, defense counsel also filed a second motion to suppress regarding certain

identification evidence.  (Doc. 25.)  Defense counsel filed an accompanying declaration, (Doc. 26), and a memorandum of law in support of the identification motion, (Doc. 27).  On January 17, 2024, the Government filed an opposition brief.  (Doc. 30.)  On January 24, 2025, defense counsel filed a reply brief.  (Doc. 31.)  On January 30, 2025, I held oral argument regarding the two motions to suppress.  (*See* Doc. 37 ("Hr'g Tr.").)  At the hearing, I ordered, among other things, a *Wade* hearing on the identification issue raised in Defendant's second motion to suppress.  (Hr'g Tr. 40:4-6.)[6]  That hearing is currently scheduled for May 2, 2025.  (*See* Doc. 39.)

This Order & Opinion involves only Defendant's first motion, dated November 4, 2024, which is a motion to suppress (1) physical evidence, specifically the vest, ammunition rounds, and iPhone, seized from Defendant purportedly in violation of the Fourth Amendment, and (2) statements made by Defendant purportedly in violation of the Fifth Amendment.  (Doc. 13.)

### III.    Discussion

#### A.  *Motion to Suppress Physical Evidence*

I first address the motion to suppress physical evidence.  As an initial matter, Mejia does not assert that the Government's entry into the apartment was unlawful.  (Hr'g Tr. 8:8-11.)  Nor does he challenge the seizure of the black mask.  (*Id.* 13:17-20.)  Rather, Defendant requests suppression of the vest, ammunition rounds, and a cellphone.  In opposition, the Government contends that the seizure and subsequent search of Mejia's personal property were permissible under two exceptions to the search warrant requirement—namely, that the seized items were in plain view, and/or were seized incident to Mejia's arrest.  (Opp'n 2.)  The Government also contends that the good-faith exception applies to the search and seizure of the iPhone.  (Hr'g Tr.

---

[6] "Hr'g Tr." refers to the transcript from the January 30, 2025 oral argument hearing I held in this matter.  (Doc. 37.)

32: 20-24.)  I first address issues related to the search warrant.

### B.  *Applicable Law*

The Fourth Amendment of the U.S. Constitution guarantees that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  In determining whether probable cause exists to support the issuance of a warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  The experience of the law enforcement agents involved in preparing the warrant application is particularly relevant to the analysis, as "experience and training may allow a law enforcement officer to discern probable cause from facts and circumstances where a layman might not."  *United States v. Gaskin*, 364 F.3d 438, 457 (2d Cir. 2004).  Ultimately, the probable cause determination is a "flexible, common-sense" inquiry based on the totality of the circumstances.  *Texas v. Brown*, 460 U.S. 730, 742 (1983).  The "proponent of the motion to suppress," bears the "burden to establish that the search violated his Fourth Amendment rights."  *United States v. Lewis*, 62 F.4th 733, 741 (2d Cir. 2023) (citation omitted).

In reviewing a magistrate judge's probable cause determination, reviewing courts must give "great deference" to the magistrate judge's findings.  *Gates*, 462 U.S. at 236 (internal quotation marks omitted).  "[S]o long as the magistrate had a 'substantial basis for concluding' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more."  *Id.* (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)) (cleaned up).  A magistrate judge's finding of probable cause weighs heavily in favor of affirming a finding of probable

cause. *See United States v. Jackstadt*, 617 F.2d 12, 13 (2d Cir. 1980) (per curiam) ("A magistrate's finding of probable cause is itself a substantial factor tending to uphold the validity of the warrant.").

"In certain circumstances, however, a defendant may challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the warrant and the resulting search or seizure." *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003) (citing, *inter alia*, *Franks v. Delaware*, 438 U.S. 154, 164–72 (1978)). "One such circumstance is where the affidavit in support of the search warrant is alleged to contain deliberately or recklessly false or misleading information." *United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000). A so-called *Franks* hearing is required when a defendant (1) makes a "substantial preliminary showing" that an affiant included in the affidavit "a false statement knowingly and intentionally, or with reckless disregard for the truth," and (2) demonstrates that "the allegedly false statement is necessary to the finding of probable cause." *Franks*, 438 U.S. at 155–56. "The *Franks* standard is a high one." *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991).

Omissions can also "serve as the basis for a *Franks* challenge." *Id*. at 604. Omissions "from a warrant affidavit are not material unless they cast doubt on probable cause." *United States v. Marin–Buitrago*, 734 F.2d 889, 895 (2d Cir. 1984). "An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *United States v. Mandell*, 710 F. Supp. 2d 368, 373 (S.D.N.Y. 2010) (quoting *Awadallah*, 349 F.3d at 67–68) (cleaned up). "This is because allegations of omission 'potentially open officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit.'" *Id*. (quoting *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990)) (cleaned up). To serve as the basis for a hearing

under *Franks*, an omission "must be such that its inclusion in the affidavit would defeat probable cause . . . Omitted information that is potentially relevant but not dispositive is not enough to warrant a *Franks* hearing." *Mandell*, 710 F. Supp. 2d at 374 (quoting *Colkley*, 899 F.2d at 300–01) (cleaned up).

Even if a search were not pursuant to a warrant, that search is permissible if it fits "within one of the narrow and specifically delineated exceptions to the warrant requirement." *Thompson v. Louisiana*, 469 U.S. 17, 21 (1984). The two relevant exceptions here are (1) the plain-view exception and (2) the search-incident-to-arrest exception. With regard to the plain-view doctrine, "a law enforcement officer may seize evidence without a warrant if (1) the officer is 'lawfully in a position from which [he] views an object,' (2) the object's 'incriminating character is immediately apparent,' and (3) the officer has 'a lawful right of access to the object.'" *United States v. Babilonia*, 854 F.3d 163, 179–80 (2d Cir. 2017) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)) (cleaned up). "If, however, the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object— *i.e.*, if 'its incriminating character is not immediately apparent,'—the plain-view doctrine cannot justify its seizure." *Dickerson*, 508 U.S. at 375 (quoting *Horton v. California*, 496 U.S. 128, 136 (1990)) (alteration adopted). The search-incident-to-arrest doctrine provides another exception to the search warrant requirement. *See, e.g., United States v. Robinson*, 414 U.S. 218, 224 (1973). This exception "permits the police to search a lawfully arrested person and areas within his immediate control." *Smith v. Ohio*, 494 U.S. 541, 543 (1990).

Absent an established exception to the warrant requirement, evidence searched or seized without a warrant must be suppressed. *Mapp v. Ohio*, 367 U.S. 643, 654–55 (1961). Any evidence directly derived from an unlawful search or seizure must also be excluded as fruit of the

poisonous tree. *Wong Sun v. United States*, 371 U.S. 471, 485–86 (1963).  "On a motion to suppress evidence in a criminal trial, once the defendant has established a basis for his motion, the burden rests on the Government to prove, by a preponderance of the evidence, the legality of the actions of its officers."  *United States v. Echevarria*, 692 F. Supp. 2d 322, 332 (S.D.N.Y. 2010) (alteration adopted).

However, "[t]he fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies."  *Herring v. United States*, 555 U.S. 135, 140 (2009).  The Supreme Court has explained that application of the exclusionary rule "has always been [its] last resort, not [its] first impulse."  *Id.* (internal quotation marks omitted).  "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."  *Id.* at 144.

Indeed, under the good-faith exception, the exclusionary rule does not apply to "evidence seized 'in objectively reasonable reliance on' a warrant issued by a detached and neutral magistrate judge, even where the warrant is subsequently deemed invalid."  *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)).  "The burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance on an invalidated warrant."  *United States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011) (internal quotation marks omitted).  "In assessing whether it has carried that burden," courts must be "mindful that, in *Leon*, the Supreme Court strongly signaled that most searches conducted pursuant to a warrant would likely fall within its protection."  *Id.*; *see also Leon*, 468 U.S. at 922 ("Searches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law

enforcement officer has acted in good faith in conducting the search." (citations and internal quotation marks omitted)).  As the Second Circuit has explained:

> It was against this presumption of reasonableness that the Supreme Court identified four circumstances where an exception to the exclusionary rule would not apply: (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.

*Clark*, 638 F.3d at 100 (internal quotation marks omitted).  The critical question is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization."  *Leon*, 468 U.S. at 922 n.23.

### C. *Application*

Defendant claims that I should suppress the vest, ammunition rounds, and the cellphone as being seized in violation of the Fourth Amendment.  I will separately analyze each piece of physical evidence.

### 1. **The Vest**

With regard to the vest, I find that the vest was properly seized under the plain-view doctrine.  Mejia does not dispute that the vest was located in the Apartment.  (Hr'g Tr. 16:7-8.)  He instead disputes that it was hanging on a curtain rod because certain video evidence purportedly suggests otherwise.  (*Id.* 16:8-9.)  His argument regarding the location of the vest hinges primarily on various law enforcement officials asking each other where the vest was found.  (Def. Mem. 8–11.)  In essence, Mejia contests where and when the vest was found and the Government's assertion that it was in plain view.

The metadata from a photograph of the vest hanging from the curtain rod shows that the

photograph was taken at 5:57 a.m. on March 19, 2024.  (*See* USAO_000234.)[7]  This is only about nine minutes after law enforcement officers first entered the Apartment.  (*See* Defense Ring Video A at 0:11 (time of entry is roughly 5:48:58 A.M.).)  To the extent Mejia continues to assert that there may have been inadvertent manipulation of the metadata, such a claim has no basis in fact and is pure speculation, and, in any event, such an assertion at most goes to the weight of the evidence, not its admissibility.  Mejia did not submit an affidavit calling into question the location of the vest.  In the absence of such an affidavit or other evidence suggesting the vest was not hanging on the curtain rod in plain view, Mejia fails to show a material factual dispute so as to trigger an evidentiary hearing.  *United States v. Parrilla*, No. 13-CR-360, 2014 WL 1621487, at *5 (S.D.N.Y. Apr. 22, 2014) ("It is [the movant's] burden to show the existence of factual dispute, and it is his burden to submit an affidavit based on personal knowledge evidencing such a dispute." (internal quotation marks omitted)), *aff'd sub nom. United States v. Kirk Tang Yuk*, 885 F.3d 57 (2d Cir. 2018).  I find that the photograph demonstrates that the vest was hanging on a curtain rod when it was seized.  The fact that there was no body-cam footage of the entry and of the vest soon after entry is of no moment.

The vest clearly falls under the plain-view exception.  Its incriminating character was immediately apparent.  The complaint, which was the basis for Defendant's arrest warrant, noted that both the February 28, 2024 apartment-door shooter and the February 29, 2024 convenience-store shooter seem to have worn a "black 'puffer'-style vest", which seems to match one worn by the Mejia in social media posts.  (Compl. ¶¶ 5.b, 6.c, 8, 9.)  As to the other elements of the analysis, Mejia does not contend that law enforcement officers were unlawfully in a position to either view or seize the vest.  *See Babilonia*, 854 F.3d at 179–80.  Because the vest falls under

---

[7] This document was one of several files which were submitted by email to me and the parties after the January 30, 2025 oral argument.

the plain-view exception, Mejia's motion to suppress the vest is DENIED.

### 2. The Ammunition

Next, I consider the ammunition which allegedly fell out of the vest. Mejia contends that Detective Gidarisingh "began searching the pockets and palpating the very jacket/vest the Government later claims to have contained the ammunition which falls from the jacket/vest while the cameras are no longer rolling." (Reply 1 (citing Bodycam Video 4 at 1:16–1:30).)[8] According to Mejia, these bullets fell out of the vest during the four-minute time period when the body-worn cameras were not turned on, in violation of NYPD policy, the so-called "Patrol Guide." (Def. Mem. 11–13.) *See also* N.Y.C. Police Dep't, Patrol Guide, Proc. No. 212-123: Use of Body-Worn Cameras (Jan. 8, 2018), https://perma.cc/NRW8-CJMU ("Patrol Guide"). Defendant then argues that this "absence of footage or activation of body cameras at pivotal junctures supporting the arrest of a felon in possession of ammunition" necessitates an evidentiary hearing. (Hr'g Tr. 19:9-13.)

In opposition, the Government contends that law enforcement officers concluded the search around 10:02 a.m., which is when they turned off the body-worn cameras, in compliance with NYPD policy. (Opp'n 6.) When the bullets fell out of the vest, law enforcement then proceeded to turn the cameras back on. (Hr'g Tr. 21:17–22:1.)

Mejia counters and notes that the NYPD's body-worn cameras—which are designed to be "consistently running" such that it can record the video, but not the audio, of the 60 seconds prior to the camera being activated, (*id.* at 24:16-25)—should have recorded the ammunition rounds falling out of the vest, (*id.* at 22:11-14).

The defense cites *United States v. Garcia*, 554 F. Supp. 3d 421 (E.D.N.Y. 2021) as

---

[8] "Reply" refers to the Defendant's reply brief filed on January 8, 2025. (Doc. 24.)

supporting its motion to suppress the ammunition.  However, *Garcia* is not dispositive to the legal issues related to the ammunition.  Indeed, the court in *Garcia* explained how federal courts are split on how to assess a law enforcement agent's failure to comply with body-camera policies in the context of the Fourth Amendment.  *Id.* at 431 (collecting cases).  The court in *Garcia* recognized that the Patrol Guide "is not law." *Id*. at 430 (quoting *Griffin v. City of N.Y.*, 880 F. Supp. 2d 384, 397 n.3 (E.D.N.Y. 2012)).  At best, the Second Circuit has referred to the Patrol Guide in "defining the official duties of police officers in civil cases." *Id.* at 430–31 (citing *Matthew v. City of N.Y.*, 779 F.3d 167, 174 (2d Cir. 2015)).

In any event, *Garcia* is distinguishable.  There, the law enforcement officer "knew that he was required to activate his body camera" but failed to do so, and also failed to provide a convincing explanation for that failure.  *Id.* at 431.  Further, that officer's testimony regarding consent was contradicted by a witness' testimony.  *Id.* at 432.  In contrast, here (1) the officers had their cameras activated during the search and turned them off when they had concluded the search; (2) the officers reactivated their cameras after the bullets fell out of the vest; and (3) Mejia does not offer any witness testimony or evidence to the contrary.  In any event, "non-compliance with department policy, without more, does not justify suppression." *United States v. Tillard*, No. 18-CR-6091, 2019 WL 8105894, at *6 (W.D.N.Y. Oct. 4, 2019) (internal quotation marks omitted), *report and recommendation adopted*, No. 18-CR-6091, 2020 WL 57198 (W.D.N.Y. Jan. 6, 2020).

Mejia seems to argue that the absence of body-worn camera footage should affect the credibility of the law enforcement agent's testimony.  (Def. Mem. 14.)  Even assuming that the absence of body-worn camera footage might undermine the credibility of some of the Government's witnesses, Mejia fails to meet his burden of showing a material factual dispute

here. First, the ammunition rounds seized in the search of the Apartment were the same caliber (.380) as those recovered in both February 2024 shootings. (Hr'g Tr. 6:1-4.) Second, it is not clear that the Patrol Guide was violated in the first place. Section 10 of the Patrol Guide states that the body-worn camera can be deactivated after "the investigative, enforcement, or other police action is concluded." Patrol Guide § 10. Section 7 of the Patrol Guide, which governs the activation of the body-worn camera, states: "In the event of an unanticipated or exigent occurrence, activate the BWC as soon as it is feasible and safe to do so after taking necessary police action to preserve human health and safety. At no time should proper tactics be compromised to begin a recording." *Id.* § 7. The Government persuasively explains that the body-worn cameras were turned off because the law enforcement officers had concluded the search, in compliance with the Patrol Guide, and that the cameras were then activated again after the ammunition fall out of the vest, also in compliance with the Patrol Guide. Although defense counsel cites to Section 4(f) of the Patrol Guide, which requires activation of the cameras "prior to engaging in" certain police actions, (Def. Mem. 13), the Government explained that the federal task force from the Department of Homeland Security, whose members do not wear such body-worn cameras, conducted entry into the Apartment not the NYPD; the NYPD officers with body-worn cameras came in later, (Hr'g Tr. 8:16-22).

Further, a photograph of the vest shows that the pocket is ripped, (USAO_000120), which further corroborates the Government's assertion that the bullets fell out of the vest's "open, internal pocket," (Opp'n 17; *see also id.* 6 ("[S]everal rounds of ammunition fell out of the interior of the vest.")). To the extent that there is any suggestion that the bullets were planted—and Mejia does not explicitly make this claim—such suggestion is mere conjecture without factual support. Mejia fails to meet his burden to show that there is a material factual

dispute that requires an evidentiary hearing on this issue.  Defendant's motion to suppress the ammunition rounds is DENIED.

### 3.  The iPhone

The next challenge concerns both the seizure and subsequent search of the iPhone.

#### a.  Seizure of iPhone

Mejia first claims that the seizure of the iPhone was unlawful.  Mejia challenges the Government's argument that the phone was seized incident to arrest.  (Def. Mem. 7–8.) According to Mejia, law enforcement lacked a search warrant for the iPhone and failed to assert facts that support that the iPhone belonged Defendant.  (*Id.*)  Mejia also emphasizes the fact that law enforcement officials surrounded him as he was seated in the Apartment and asked him if the phone belonged to him.  (*Id.* 18.)  According to Mejia, this questioning belies the Government's argument that the phone was seized in plain view or incident to search.  Because law enforcement was unclear as to where and when the phone was found, Defendant argues that an evidentiary hearing is required.  (*Id.* 19.)

I find that the iPhone was lawfully seized under either (1) the incident-to-arrest exception or (2) the plain-view exception.  Even one of these exceptions is sufficient to reject Mejia's challenge of the seizure of the iPhone.

As an initial matter, the Government states that law enforcement had "recovered the cell phone from the bed where the defendant was laying when he was arrested."  (Opp'n 14 (citing GX 3 at USAO_000129; GX 4 at USAO_000038).)  This establishes the incident-to-arrest exception because Mejia was in the bed and the phone was near him.  This alone is sufficient to deny the motion to suppress the iPhone based on an unlawful seizure.  Seizing the iPhone incident to arrest also allows law enforcement officers to "safeguard[] any evidence of the

offense of arrest that an arrestee might conceal or destroy," which is one of the well-accepted justifications for a search incident-to-arrest. *See Arizona v. Gant*, 556 U.S. 332, 339 (2009); *see also, e.g.*, *United States v. Skyfield*, No. 23-CR-569, 2023 WL 8879291, at *13 n.10 (S.D.N.Y. Dec. 22, 2023) ("Because the iPhone was next to [Defendant] in the bedroom at the time of his arrest, the NYPD was entitled to take the iPhone as a seizure incident to arrest." (internal quotation marks omitted)).

However, the Government's claim—that the phone was recovered from the bed where Defendant was laying—also establishes that law enforcement agents were lawfully in a position to see and seize the iPhone. Mejia does not concede that the iPhone was found next to him, (Def. Mem. 8), but does not offer an alternative explanation of where it was located when law enforcement officers entered the bedroom. Accordingly, Mejia's dispute of where the phone was located, without more, does not help him meet his burden to raise a material factual dispute to require a hearing.

Thus, the only question under the plain-view inquiry is whether the phone had an immediately apparent incriminating character. For that question, the Second Circuit opinion in *United States v. Babilonia*, 854 F.3d 163 (2d Cir. 2017), is instructive. In *Babilonia*, the Second Circuit affirmed the district court's conclusion that law enforcement's seizure of cellphones, among other things, was "justified" due to "evidence of possible criminal activity under the plain view doctrine because any incriminating character of such items cannot be immediately discerned." *Id.* at 179. The panel further stated that it was "not troubled by the agents' warrantless seizure of [the defendant's] cell phones . . . particularly as the agents did not search the electronic devices until after a warrant had been obtained." *Id.* at 180. The Second Circuit's decision was notwithstanding its understanding that cellphones are ubiquitous objects; the Court

of Appeals noted it was "mindful that the presence alone of a cell phone, or even several cell phones, in a home is not inherently incriminating." *Id.* *Babilonia* is directly on point.

Here too, the seized iPhone was legally seized under the plain-view doctrine. The complaint underlying the arrest warrant, as well as the search warrant authorizing the use of a cell site simulator, contain information sufficient to show that the cellphone likely would have evidence of the February 2024 Shootings. The Government's first warrant authorizing the use of a cell site simulator to identify the seized phone shows that the cellphone had its associated phone number changed multiple times, even as the device stayed the same. (Opp'n, GX 1 at USAO_000061–66 (Magistrate Judge Gary Stein authorizing warrant on March 18, 2024).) Moreover, the search warrant for the phone describes facts that support a finding of probable cause as to why the phone would contain incriminating evidence. (Opp'n 14.) For example, video footage shows that the suspect in the Door Shooting used a cellphone, which may have text messages or location information relevant to that shooting. (*Id.* 14–15.) Because the Government could not "immediately discern[]" whether the phone had such an "incriminating character" without searching the phone, the Government was entitled to seize it. *Babilonia*, 854 F.3d at 179. Like in *Babilonia*, law enforcement officers did not search the iPhone until several days later after obtaining a search warrant. (*See* Opp'n, GX 3 at USAO_000122 (Magistrate Judge James L. Cott authorizing warrant on March 25, 2024 at 10:03 a.m.).)

I therefore find that an evidentiary hearing regarding the seizure of the iPhone is not necessary, and find that I have sufficient information from the underlying documents to determine that both (1) the incident-to-search exception and (2) the plain-view exception apply. *United States v. Barrett*, No. 23-CR-623, 2025 WL 371084, at *22 (S.D.N.Y. Feb. 3, 2025) (rejecting request for evidentiary hearing regarding plain-view exception to search). Because the

seizure of the iPhone would have been permitted under either the incident-to-arrest exception or the plain-view exception, the motion to suppress based on unlawful seizure is DENIED.

b. Search of iPhone

The next issue concerns the search of the iPhone. This inquiry requires a determination: (1) of whether there was probable cause for the warrant and (2) if so, whether there was misleading information in the application for the warrant. *See Clark*, 638 F.3d at 100. The application for the search warrant includes Detective Tepperman's affidavit stating that the iPhone was "seized incident to the arrest" of Mejia on March 19, 2024. (Opp'n, GX 3 at USAO_000128.) The affidavit explicitly states that it "does not include all the facts that [Detective Tepperman] [had] learned during the course of [his] investigation." (*Id.*) Detective Tepperman's affidavit also explains why he believed there was probable cause, including that the phone was located near Mejia, descriptions of the February 2024 Shootings, Defendant's Instagram account containing an image of a masked individual wearing what appears to be the same sneakers and vest as the ones worn during the February 2024 Shootings, that the iPhone may have location information related to the February 2024 Shootings, and Mejia's likely involvement with gangs and financial crimes. (Opp'n, GX 3 at USAO_000128–34.) I find that this application, which includes Detective Tepperman's affidavit, sufficiently demonstrates probable cause.

Defendant primarily argues in a post-oral-argument letter that the application for the warrant is defective because it failed to disclose (1) the statement from Defendant's girlfriend that everything in the bedroom belonged to her and (2) law enforcement's questions to Defendant regarding whether the phone belonged to him. (Doc. 33 at 1–2.) According to Mejia, these deficiencies are "material omissions from the warrant application" that require an

evidentiary hearing.  (*Id.* 2.)

I find that these omissions from Detective Tepperman's affidavit are not material because they do not "cast doubt on the existence of probable cause."  *Marin–Buitrago*, 734 F.2d at 895. Because these omissions do not "defeat probable cause," a *Franks* hearing is not necessary. *Mandell*, 710 F. Supp. 2d at 374 (internal quotation marks omitted).

The statement by Mejia's girlfriend that everything in the bedroom belonged to her is demonstrably false.  Mejia was living in the Apartment, he was asleep in the bedroom when law enforcement officers entered, and items that apparently belonged to Mejia, including the vest, mask, and iPhone, as well as what seems to be Mejia's debit cards, health insurance cards, and Social Security card, and a New York State commercial learner permit belonging to an "Aris Palmero-Quezada,"[9] were in the bedroom.  (*See* USAO_000120 (photograph of, among other things, debit, health insurance, and Social Security cards).)  In other words, her statement was not credible and was rebutted by evidence that was in plain view.

With regard to the questions about the phone, the mere fact that law enforcement officers asked Mejia if the phone was his, does not mean that the officers did not have sufficient information to establish probable cause.  Indeed, the law enforcement officers were doing their jobs investigating and attempting to get additional evidence that the phone belonged to Mejia; there is nothing wrong or improper about their efforts.  Accordingly, I agree with the Magistrate Judge's findings of probable cause for the warrant.

In any event, even if the warrant lacked probable cause, the good faith exception would apply.  As an initial matter, the argument regarding a good-faith exception is not waived, and I

---

[9] It is unclear whether the photograph in the New York State commercial learner permit shows Mejia or someone else.

can raise it sua sponte.  *See, e.g.*, *United States v. Martinez*, No. 20-CR-98, 2021 WL 7159898, at *5 n.6 (E.D.N.Y. Nov. 17, 2021) (raising issue sua sponte), *report and recommendation adopted*, 2022 WL 214608 (E.D.N.Y. Jan. 25, 2022); *United States v. Fugate*, 499 F. App'x 514, 518 (6th Cir. 2012) (reviewing de novo the merits of district court's sua sponte decision on whether the good-faith exception to the exclusionary rule applies even though the Government did not raise the issue).  Mejia again argues that having a hearing would be the "better approach" to determine whether Detective Tepperman, who "swore out the application" for the warrant and also participated in the search and seizure in the Apartment, acted reasonably to establish good faith.  (Doc. 33 at 4.)  I do not find that any of the four exceptions to the good-faith exception exists here.  Nor is a hearing necessary.  The papers before me have sufficiently demonstrated that Detective Tepperman and other members of law enforcement were objectively reasonable in their reliance on the search warrant.  Therefore, even if the search warrant application lacked probable cause, the motion to suppress the search of the iPhone is DENIED.

### D.  *Motion to Suppress Post-Arrest Statements*

I will now discuss the motion to suppress Mejia's statements.  As an initial matter, the Government disclaims any intent to offer at trial any pre-*Miranda* statements made by Defendant, "in response to pedigree-type questions, because none of them were particularly probative."  (Opp'n 2.)  Accordingly, I focus only on Defendant's statements made after the *Miranda* warnings were given; all of which occurred at the Precinct, both in the interview room and during Mejia's transportation from the interview room to the holding cells.  (Def. Mem. 20–24; Reply 11 ("[A]ll of the statements made at the 44th Precinct must be suppressed.").)

Mejia argues that the Government cannot meet its burden of proving that he made a knowing and voluntary waiver of his *Miranda* rights.  (Def. Mem. 22.)  In opposition, the

Government argues that Mejia, even after being advised of his *Miranda* rights, did not unequivocally invoke those rights. (Opp'n 19.) I note that the parties do not dispute that Mejia was in "custody" during his questioning at the Precinct. Instead, the issue turns on whether he unambiguously invoked his Fifth Amendment rights.

### 1. Applicable Law

Pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), a suspect in custody must receive certain warnings before he can be subjected to interrogation. A defendant must "unambiguously" invoke his right to counsel or his right to remain silent. *See Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) (quoting *Davis v. United States*, 512 U.S. 452, 459 (1994)).

### 2. Application

As an initial matter, I note that Mejia clearly indicated that he understood the rights when they were read to him by Detective Tepperman. However, I find that Defendant did not unambiguously invoke his Fifth Amendment rights. In isolation, Mejia's statement that he was not willing to answer any questions probably would have been a valid invocation of his right to remain silent. However, Mejia also stated that he wanted to learn more about his charges and arrest. *United States v. Dawes*, 495 F. App'x 117 (2d Cir. 2012) (summary order) is instructive on this point. In *Dawes*, the Second Circuit determined that the "[d]efendant did not unambiguously invoke his Fifth Amendment rights." *Id.* at 120. Even though the defendant invoked the "'Fifth Commandment' [*sic*] before the interrogation began," the Court of Appeals concluded that his "immediate[] quer[y]" of "'I want to know why I'm here,' indicat[ed] [that] he had not unequivocally asserted his Fifth Amendment rights." *Id*. Similarly, in *Bradley v. Meachum*, the Second Circuit held that, even though the defendant "initially stated that he did

23

not wish to discuss his involvement in the crime," the defendant's "immediate[] deni[al]" of any connection to the crime and explanation of an alibi constituted conduct that was not an invocation of his right to remain silent. *Bradley v. Meachum*, 918 F.2d 338, 342 (2d Cir. 1990).

Mejia concedes that he stated he was willing to hear what he was arrested for immediately after stating that he did not want to answer any questions. (Def. Mem. 21 (citing USAO_00054 at 3:55–4:15).) The Government quotes Mejia's statement that he was "willing to hear you guys out" to get a "better understanding" of what was going on. (Opp'n 19.) Mejia's statement that he was unwilling to answer questions while, in the same breath, expressing his willingness to engage with law enforcement officers about the underlying allegations and arrest, do not demonstrate an unambiguous invocation of his Fifth Amendment rights. Detective Tepperman's explanation to Defendant that the "federal arrest warrant" relates to "two shootings that happened last month" were a direct answer to Mejia's question. "After giving a *Miranda* warning, police may interrogate a suspect who has neither invoked nor waived *Miranda* rights." *Berghuis*, 560 U.S. at 388. That is precisely what happened here. In short, I find that Mejia clearly stated that he understood his Fifth Amendment rights, but that he did not unambiguously invoke those rights.

Because I find that Mejia did not unambiguously invoke his Fifth Amendment rights, I need not find whether there was any waiver of such invocation. The motion to suppress Defendant's Mirandized statements is DENIED.

IV.    <u>**Conclusion**</u>

For the reasons discussed, Defendant Mejia's motion to suppress is DENIED.

SO ORDERED.

Dated: March 27, 2025
     New York, New York

                                                   Vernon S. Broderick
                                                   United States District Judge